IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KYETHA SWEETING,

    Plaintiff,

v.

VICTOR HILL, in his official capacity
as the Sheriff of Clayton County, Ga.;
and CLAYTON COUTY, GEORGIA,

    Defendants.

CIVIL ACTION FILE NO.
1:19-cv-02200-JPB-LTW

## MAGISTRATE JUDGE'S FINAL
## REPORT AND RECOMMENDATION

    This case is before the Court on a Motion for Summary Judgment ([Doc. 44])

filed by Defendant Victor Hill in his official capacity as the Sheriff of Clayton County

("Defendant"), and by Defendant Clayton County itself.[1]  For the reasons detailed

below, the undersigned **RECOMMENDS** that Defendant's Motion be **GRANTED in**

---

[1] Plaintiff concedes that she was not employed by Defendant Clayton County and that Clayton County "should be dismissed as a defendant."  [Doc. 48 at 4–5].  As such, all references to "Defendant" below refer to Defendant Victor Hill in his official capacity as the Sheriff of Clayton County unless otherwise specified.  Because Victor Hill is sued only in his official capacity, the undersigned uses the personal pronoun "it" when referring to Defendant because "the real party in interest . . . is the governmental entity and not the named official," as will be discussed more below.  Hafer v. Melo, 502 U.S. 21, 25 (1991).

**part and DENIED in part**.

## FACTUAL BACKGROUND

This factual background is drawn from the parties' statements of material facts to the extent such facts are undisputed.  When a fact is disputed and both parties have cited to evidence in the record in support of their version of events, the Court draws on the evidence itself and has viewed all evidence and made all factual inferences in the light most favorable to Plaintiff.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); McCabe v. Sharrett, 12 F.3d 1558, 1560 (11th Cir. 1994); Reynolds v. Bridgestone/Firestone, Inc., 989 F.2d 465, 469 (11th Cir. 1993).

Plaintiff was employed by Defendant as a Sheriff Correctional Officer ("SCO") from March 21, 2011 until her termination on January 7, 2019.  [Doc. 52-1 ¶1]. Plaintiff suffers from migraine headaches and began to seek medical treatment for the same in January 2012.  [Id. at ¶2].  On August 13, 2017, Plaintiff suffered a workplace injury in a fight with an inmate while attempting to help another SCO.  [Doc. 49 ¶42]. Plaintiff's workers' compensation doctor released her to full duty with no limitations on January 25, 2018.  [Id. ¶48].  Plaintiff then applied for intermittent leave under the Family and Medical Leave Act of 1993 ("FMLA") from January 23, 2018 through April 17, 2018, and Defendant granted the request.  [Id. ¶49].

On March 27, 2018, Plaintiff provided a note from her medical provider seeking "2 days off per week, due to chronic nature of headache/migraine." [Id. ¶66]. Plaintiff needed two days off in a row so she could "take the medication that [she] was prescribed more consistently." [Doc. 45 at 285:16–23]. Defendant granted the request, giving Plaintiff Wednesdays and Thursdays off work. [Doc. 49 ¶67]. In late April 2018, Plaintiff submitted a request seeking to work in a "low-lit, low-noise area for the next two weeks." [Id. ¶68]. Again, Defendant granted the request, placing Plaintiff in the medical unit control tower. [Id. ¶69]. Plaintiff was assigned to the medical infirmary "[b]ecause she needed a low-light, low sound area to work in." See [Doc. 50 at 34:12–13]. The "infirmary or the medical area [also] has a lot less inmates," containing 27 cells, which are either double or triple celled, compared to the normal housing units that hold up to 288 inmates each. [Id. at 30:23–24]; see also [Doc. 49 ¶¶11, 35]. On October 24, 2018, Plaintiff submitted another request for accommodation, asking to work "in low-light, low-noise environment with no overtime due to her health condition." [Doc. 49 ¶70]. Defendant again granted the request, continuing to have Plaintiff work in the medical unit control tower. [Id. ¶71].

As part of Plaintiff's annual performance evaluation for 2017–18, one of Plaintiff's superiors incorrectly calculated the number of no-call, no-shows Plaintiff had during the relevant period. See [id. ¶¶51, 55, 62]. Plaintiff complained, and on

November 14, 2018, Defendant ordered that Plaintiff be transferred "to morning watch ASAP where she [would] not be under [that individual's] direct supervision." See [id. ¶¶56–60]. This change in schedule apparently interfered with Plaintiff's medication schedule. See [Doc. 45 at 303:20–304:16]. On December 11, 2018, Plaintiff submitted a note from her doctor asking that Plaintiff "work a Monday-Friday schedule on her current shift to allow her to better manage her medications regime." [Doc. 49 ¶72]. The note also says, "for the next three weeks . . . please limit any contact with inmates for her safety, as she is experiencing significant lightheadedness presumed related to her migraines." [Id.].

Assistant Chief Shawn Southerland reviewed Plaintiff's December 11, 2018 request and believed it was "not in line with her job duties and description" because the limitations raised safety concerns related to having contact with inmates and was unclear as to whether the limitations would change in the near future. [Id. ¶73]. As a result, Assistant Chief Southerland sought a fitness-for-duty certification from Plaintiff's medical provider. [Id. ¶74]. Plaintiff indicated she wanted her neurologist to also weigh in on the restrictions. [Id. ¶75].

Plaintiff then submitted her neurologist's recommendations, which included a request that Defendant "limit her contact to inmates, as she is experiencing lightheadedness and this may be detrimental to her safety." [Id. ¶78]. On January 7,

2019, Plaintiff's primary care physician faxed Plaintiff's fitness-for-duty form to Defendant's human resources ("HR").  [Id. ¶84].  Plaintiff's physician indicated Plaintiff was not fit for duty, could not perform the essential functions of the job, and that she was "uncertain" when Plaintiff's condition would end.  [Doc. 48-3 at 2].  However, the physician also indicated Plaintiff could perform sedentary work and that she expected "a fundamental or marked change in [Plaintiff's] condition" within one month that would allow Plaintiff "to perform essential and additional functions of the job."  [Id. at 3–4].  Around this time, on January 3, 2019, Plaintiff spoke with HR regarding FMLA eligibility and HR informed Plaintiff that she had exhausted her FMLA leave due to leave taken in 2018.  [Id. ¶76]; see also [id. ¶50].  HR told Plaintiff she could apply for FMLA leave at the beginning of her next FMLA year on January 23, 2019.  [Id. ¶77].

Assistant Chief Southerland reviewed the note from Plaintiff's neurologist and discussed the fitness-for-duty form submitted by the primary care physician with HR, and he believed Plaintiff was making "an open-ended request" to "eliminate inmate contact" without any indication Plaintiff would ever be able "to resume the essential functions of the SCO position."  See [id. ¶¶79, 87].  Defendant decided to terminate Plaintiff because she "could not perform the essential functions of her position."  [Id. ¶¶88, 90].

Along with her termination papers, Plaintiff was also served with a "Criminal Trespass Warning." [Doc. 52-1 ¶36].  It is Defendant's policy to issue such a warning to any employee who is terminated.  [Id. ¶41].  The warning says Plaintiff is "forbidden from the premises of the Clayton County Sheriff's Office and the Clayton County Courthouse" and that she is subject to prosecution if she violates the warning.  [Id. ¶¶38–39].  Defendant admits that there is no reasonable basis for preventing a former employee from accessing public areas.  [Doc. 50 at 72:14–16].  The warning further says, "If you have a legitimate reason to enter the property, on official business, you are to make contact with the Clayton County Sheriff's Office Internal Affairs unit, and schedule an appointment with them in advance. The Internal Affairs unit will assist you in accessing the building."  [Doc. 52-1 ¶40].  Defendant explained that this means a former employee would need to contact Internal Affairs before coming to the courthouse even if the employee were coming "for jury duty or to watch court or just because [she wants] to be there."  [Doc. 50 at 73:13–74:4].

Defendant receives federal funds through a partnership with the Drug Enforcement Agency and Department of Justice whereby Defendant may receive money forfeited from drug enforcement actions (the "DEA/DOJ narcotics program").

[Doc. 52-1 ¶46].[2]  Agencies that participate in the program are notified that they are subject to federal anti-discrimination laws, including Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq*. (the "Rehabilitation Act").  [Id. ¶49].  Clayton County received money from this program during the relevant fiscal year running from July 1, 2018 through June 30, 2019.  [Id. ¶50].  However, Defendant testified, "we didn't access any of that money."  [Doc. 50 at 61:3–23].

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial responsibility of asserting the basis for her motion.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Apcoa, Inc. v. Fid. Nat'l Bank, 906 F.2d 610, 611 (11th Cir. 1990).  The movant can

---

[2] Defendant simply says that this fact is "Denied."  [Doc. 52-1 ¶46].  To dispute a statement of fact, a party must (i) "directly refute[ ]" the fact with a concise response "supported by specific citations to evidence," (ii) state "a valid objection to the admissibility" of the fact, or (iii) demonstrate that the fact is not supported by the evidence cited or "is not material or otherwise [does not] comply with the provisions set out" in the Local Rules.  N.D. Ga. Loc. R. 56.1(B)(2)(a)(2).  If a party does not do one of those three things, the fact is deemed admitted.  Id.  By simply saying "Denied," Defendant did not cite any evidence refuting the fact, state a valid objection to the fact's admissibility, or demonstrate the fact was unsupported, immaterial, or otherwise failed to comply with the Local Rules.  [Doc. 52-1 ¶46].  As such, any fact Defendant simply "Denied" is deemed admitted.  N.D. Ga. Loc. R. 56.1(B)(2)(a)(2).

discharge this burden by merely "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.  After the movant has carried her burden, the non-moving party is then required to "go beyond the pleadings" and present competent evidence designating specific facts showing a genuine disputed issue for trial.  Id. at 324.

While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, Nat'l Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1236 (11th Cir. 2003), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." Anderson, 477 U.S. at 249-50.

## <u>LEGAL ANALYSIS</u>

Plaintiff brings claims under the FMLA, the Rehabilitation Act, and the Americans With Disabilities Act of 1990, 42 U.S.C. § 12101 <u>et seq</u>. ("ADA"), alleging that she was discriminated against, retaliated against, and that Defendant interfered with her FMLA rights.  [Doc. 8 ¶¶48–82].  Plaintiff also alleges violations of her "rights under the U.S. Constitution, including her rights under the First and Fourteenth Amendments," although she does not explicitly state that this claim is under 42 U.S.C. § 1983.  <u>See</u> [Doc. 8 ¶¶83–86].  Because Plaintiff's claims under the ADA and the Rehabilitation Act have the same standards and apply the same analytical framework, those claims are analyzed together first.  <u>See</u> <u>Cash v. Smith</u>, 231 F.3d 1301, 1305 (11th Cir. 2000).  The Court then turns to Plaintiff's claims under the FMLA and then addresses her claim under § 1983.

## I.    <u>Plaintiff's ADA/Rehabilitation Act Claims</u>

Plaintiff brings two kinds of claims under the ADA and the Rehabilitation Act: discrimination claims and retaliation claims.  <u>See</u> [Doc. 8 ¶¶48–73].  The undersigned addresses each set of claims in turn before discussing Defendant's final argument regarding these claims—that it is not liable under the Rehabilitation Act because it did not "receive[ ] federal funding during the 2018–2019 fiscal year."  <u>See</u> [Doc. 44-2 at 18–20].

A.    The Discrimination Claims

Plaintiff's discrimination claims require her to show: (1) she is disabled; (2) she is a qualified individual; and (3) she was subjected to unlawful discrimination because of her disability.  Holly v. Clairson Indus., L.L.C., 492 F.3d 1247, 1255–56 (11th Cir. 2007).  The term "discrimination," in this context, includes "not making reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A).

Defendant argues Plaintiff has "failed to establish a disability under the ADA," and thus cannot satisfy the first element of her discrimination claims.  [Doc. 44-2 at 14].  The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1); see also 34 C.F.R. § 104.3(j)(1).  The phrase "major life activities" includes working.   42 U.S.C. § 12102(2)(A).   To demonstrate her impairment substantially limits her in working, Plaintiff must show the impairment substantially limits "her ability to perform a class of jobs or broad range of jobs in various classes as compared to most people having comparable training, skills, and abilities."  29 C.F.R. § Pt. 1630, App. *Substantially Limited in Working*.

Here, Plaintiff's physician explicitly stated that Plaintiff's migraines prevent her "from performing a broad class of jobs [and] not just a particular job." [Doc. 48-3 at 3]. Specifically, Plaintiff could not perform any work "involving bright lights [and] loud sounds." [Id.]. Because of her periodic lightheadedness, Plaintiff was also limited to no "more than 20 minutes" in terms of "standing or walking." See [id. at 2, 4]. Construing these facts in the light most favorable to Plaintiff, she has created a triable issue of fact as to whether she was "disabled" within the meaning of the ADA and Rehabilitation Act. Also, as Plaintiff points out, Defendant explicitly decided to terminate Plaintiff because it concluded she was unable "to perform essential tasks and functions due to physical/medical limitations." [Doc. 48 at 5–6]; see also [Doc. 48-2]. Thus, even if Plaintiff's impairment did not, in fact, limit her in a major life activity, there is a genuine issue of material fact as to whether she was "regarded as" disabled by Defendant. See 42 U.S.C. § 12102(1)(C); see also Pritchard v. S. Co. Servs., 92 F.3d 1130, 1134 (11th Cir.) (holding that the plaintiff created a genuine issue of material fact regarding whether her employer "regarded her as being impaired"), *amended in part on other grounds*, 102 F.3d 1118 (11th Cir. 1996).

Defendant also argues Plaintiff is not a "qualified individual" because there was no reasonable accommodation that would have allowed her to perform the essential functions of the SCO position. [Doc. 44-2 at 10–14]; see also 42 U.S.C. § 12111(8)

(defining a "qualified individual" as someone "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires").  Specifically, Defendant argues Plaintiff "sought perpetual light duty and the elimination of essential functions in the form of 'low light, low noise, no inmate interaction, and no overtime'" and that there was no "end date" to the restrictions.  [Doc. 44-2 at 10] (quoting [Doc. 45 at 283:8–9, 284:19–24]).

When an employee cannot "perform the essential functions of [her] job either presently or in the immediate future" because of "uncertainty about when," if ever, she will be able to return to work, she is "not a 'qualified individual' under the ADA."  See Billups v. Emerald Coast Utilities Auth., 714 F. App'x 929, 936 (11th Cir. 2017); see also Wood v. Green, 323 F.3d 1309, 1314 (11th Cir. 2003) ("The ADA covers people who can perform the essential functions of their jobs presently or in the immediate future.").  This rule applies when an employee has "no way of knowing when [her] doctor would allow [her] to return to work in any capacity."  See Duckett v. Dunlop Tire Corp., 120 F.3d 1222, 1226 (11th Cir. 1997).  A request for "indefinite leave— meaning that an employee cannot say whether or when she will be able to return to work at all—will constitute an undue hardship, and so does not have to be provided as a reasonable accommodation."  EEOC Publication: *Employer-Provided Leave and the*

*Americans     with     Disabilities     Act*,     available     online     at
https://www.eeoc.gov/eeoc/publications/ada-leave.cfm (published May 9, 2016; last
visited May 11, 2021).  But if an employee "likely would have been able to work within
a month or two," her leave request was not indefinite and can be a reasonable
accommodation.  See Duckett, 120 F.3d at 1226; see also Santandreu v. Miami Dade
Cty., 513 F. App'x 902, 905 (11th Cir. 2013) (noting that "a leave of absence may be
a reasonable accommodation"); 29 C.F.R. § Pt. 1630, App. *Section 1630.2(o)
Reasonable Accommodation* (stating that "providing additional unpaid leave" may be
a reasonable accommodation).

Defendant and its witness appear to overstate the extent and duration of
Plaintiff's limitations during her tenure.  Defendant's witness suggested Plaintiff's
condition had an impact on her ability to perform her position "for several years," but
the evidence does not support the assertion.  See [Doc. 50 at 36:7–38:9].  In 2017,
Plaintiff suffered a workplace injury while protecting another SCO, but there is no
suggestion the injury had anything to do with her migraines.  [Doc. 49 ¶42].  Plaintiff
did not even return to work until January 25, 2018, less than a year before her
termination.  [Id. ¶48].  And there is no evidence Plaintiff requested an accommodation
specifically related to her migraines until March 27, 2018.  [Id. ¶66].  That request was
quite limited: Plaintiff's physician simply asked that Plaintiff's days off work be

consecutive.  See [id.].  Plaintiff did not ask to work in a low-light, low-noise environment until late April 2018, and that request lasted for only two weeks.  [Id. ¶68]. Plaintiff did not make another request for an accommodation until October 24, 2018, approximately two-and-a-half months before she was fired.  [Id. ¶70].

Importantly, as Plaintiff notes, the fitness-for-duty form completed by her physician indicated "she would be able to perform all the essential functions [of her job] in a period of one month."  [Doc. 48 at 13]; see also [Doc. 48-3 at 4].  In reply, Defendant contends that "Plaintiff requested much more than just a need for . . . a month of leave," and argues that "Plaintiff's neurologist asked Defendants to continue Plaintiff on light duty until at least March 12, 2019."  [Doc. 52 at 5–6].  Plaintiff has the better of the argument.  The form submitted by Plaintiff's physician clearly says Plaintiff was expected to "recover sufficiently to perform [the] essential and additional functions of [her] job" within one month—i.e. by February 7, 2019.  [Doc. 48-3 at 4]. Contrary to Defendant's argument, Plaintiff's neurologist did not state that Plaintiff's restrictions would last until at least March 12, 2019.  Instead, the letter simply says, "Her next appointment in Neurology [is] on 3/12/19"; it says nothing about how long the restrictions would last.  [Doc. 48-8].  Even if Plaintiff's neurologist had suggested the restrictions would last until March 12, 2019, this would simply create an issue of material fact to be decided by a jury—When would Plaintiff have sufficiently

recovered to perform the essential functions of her position?

The kinds of cases where plaintiffs have been found to be unable to perform the essential functions of their job "in the immediate future" are readily distinguishable. Here, Plaintiff never claimed she was "totally disabled and unable to work at all." See Slomcenski v. Citibank, N.A., 432 F.3d 1271, 1280 (11th Cir.2005); Lewis v. Zilog, Inc., 908 F. Supp. 931, 945 (N.D. Ga. 1995); see also Kurzweg v. SCP Distributors, LLC, 424 F. App'x 840, 843–44 (11th Cir. 2011) (addressing a social security disability recipient asserting an ADA claim); Counts v. WenMarr Mgmt. Co., LLC, No. CIV.A.1:03-CV2775TWT, 2005 WL 1404792, at *2 (N.D. Ga. Mar. 3, 2005) (plaintiff conceded he was "totally disabled from work").  Plaintiff also did not take leave for numerous months in a row with no end in sight.  Duckett, 120 F.3d at 1226 (employee "had already been on medical leave for ten months" and "could not represent that he likely would have been able to work within a month or two"); Billups, 714 F. App'x at 936 (employee "received over six months of medical leave to allow recovery" and was still "uncertain[ ] about when [he] could perform the essential functions of his position in the future"); Santandreu v. Miami Dade Cty., 513 F. App'x 902, 906 (11th Cir. 2013) (employee "received a total of fifteen months of leave, and still had no way of knowing when his doctor would allow him to resume full-time work").

A reasonable jury could find, based on the fitness-for-duty form, that Plaintiff would have "recover[ed] sufficiently to perform [the] essential and additional functions of [her] job" with one month of leave.  [Doc. 48-3 at 4].  Once an individual identifies an accommodation that would allow her to perform the essential functions of her position, the burden shifts to the employer to show "that the accommodation would impose an undue hardship on the operation of [its] business." 42 U.S.C. § 12112(b)(5)(A).  This is true even if the employee is requesting leave above and beyond her already exhausted her FMLA leave.  See EEOC Publication: *Employer-Provided Leave and the Americans with Disabilities Act*, available online at https://www.eeoc.gov/eeoc/publications/ada-leave.cfm (published May 9, 2016; last visited May 11, 2021) (stating that an employer "must consider providing unpaid leave to an employee with a disability as a reasonable accommodation if the employee requires it, and so long as it does not create an undue hardship for the employer," even if the employee has exhausted her FMLA leave (emphasis in original)).  Defendant nowhere argues that granting Plaintiff a month of leave would have imposed an undue hardship.  See [Doc. 44-2]; [Doc. 52].

This assumes, of course, that Plaintiff was *not* able to perform the essential functions of her position in January 2019, which is not clear from the record. Defendant argues Plaintiff "could not supervise or interact with inmates" and "could

only perform 'sedentary' work." [Doc. 44-2 at 12]. The restriction to "sedentary work as detailed here" is found only in the fitness-for-duty form, and Plaintiff's physician explained Plaintiff could still stand or walk for 20 minutes or less. [Doc. 48-3 at 3–4]. Defendant nowhere explains how such a restriction prevented an SCO working the medical unit control tower, like Plaintiff was, from performing the essential functions of her position. See [Doc. 44-2 at 12–14]. Instead, Defendant's focus is on its assertion Plaintiff could have "no inmate interaction." See [id. at 10, 12] (quoting [Doc. 45 at 283:8–9, 284:19–24]).

But the use of the phrase "no inmate interaction" appears only in Plaintiff's deposition. [Doc. 45 at 283:8–9, 284:19–24]. Plaintiff's medical providers only said to "limit" Plaintiff's contact with inmates. [Doc. 48-6]; see also [Doc. 48-8] ("Please limit her contact with inmates . . . ."). And the restriction does not appear anywhere in the fitness-for-duty form, which was submitted after the notes asking to "limit" Plaintiff's contact with inmates. See [Doc. 48-3]. Again, the Court must construe the facts in the light most favorable to the non-movant, so the Court assumes that the doctors said what they meant and meant what they said. Plaintiff only needed to "limit her contact with inmates," not eliminate any contact entirely; and that restriction itself may have been over by the time the fitness-for-duty form was submitted on January 7, 2019. [Doc. 48-8]; see also [Doc. 48-3].

The record indicates that Plaintiff could have been accommodated by continuing to work in the medical unit control tower.  Defendant had already determined that the assignment was a reasonable accommodation for the limitations Plaintiff had as of October 24, 2018.  [Doc. 49 ¶¶70–71].  The restriction that caused Defendant concerns was the limitation on Plaintiff "having contact with inmates."  [Id. ¶73].  As discussed above, because the Court must construe the facts in the light most favorable to Plaintiff, the Court assumes Plaintiff only needed to "limit her contact with inmates," not eliminate any contact.  [Doc. 48-8].  As Defendant's witness admitted, the "infirmary or the medical area [also] has a lot less inmates."  [Doc. 50 at 30:23–24].  Specifically, the infirmary has 27 cells, while the normal housing units that hold up to 288 inmates each.  [Doc. 49 ¶¶11, 35].  A reasonable jury could find that being assigned to the medical unit, especially the control tower, would have allowed Plaintiff to "limit her contact with inmates" as directed by Plaintiff's neurologist.  See [Doc. 48-8].

One of the cases relied on by Defendant is quite illustrative, but falls short.  In Pickering v. City of Atlanta, 75 F. Supp. 2d 1374 (N.D. Ga. 1999), the plaintiff took a medication that increased her risk of hemorrhage if she suffered a traumatic injury.  75 F. Supp. 2d at 1376.  As such, plaintiff's doctor stated she "may not engage in any activity in which she may sustain injury."  Id.  Pickering was assigned to a position that limited her "to performing breath tests, preparing paperwork, answering telephones,

and performing other physically restricted tasks." Id. at 1377.  The defendant received a fitness-for-duty evaluation that conflictingly said Pickering was both fit "for regular duty" but also that she could perform "no hazardous duty."  Id.  The defendant then followed up with the doctor and "informed the examining physician that plaintiff's original job as a corrections officer included inmate supervisory duties which involved a risk of physical confrontation."  Id.  The doctor "revised his determination" and stated Pickering was "unable to function in her capacity as a corrections officer."  Id.

Pickering is readily distinguishable from the case at bar.  In Pickering, the plaintiff's doctor clearly stated the plaintiff was prohibited from "*any* activity in which she may sustain injury."  75 F. Supp. 2d at 1376 (emphasis added).  As discussed above, Plaintiff only needed to "limit her contact with inmates."  [Doc. 48-8].  In Pickering, the plaintiff's restrictions lasted "for over two years" with no end in sight.  See 75 F. Supp. 2d at 1379.  As discussed above, the fitness-for-duty form indicated Plaintiff's condition would markedly improve within a month.  See [Doc. 48-3 at 4].  Crucially, in Pickering the "defendant created a new job for plaintiff" to accommodate her because there was no "permanent" opportunity "that was available and for which she was qualified."  75 F. Supp. 2d at 1379.  That is not the case here.  Plaintiff continued to work as an SCO, she was simply assigned to a particular post—the medical unit control tower.  See [Doc. 49 ¶¶69, 71]; see also [id. ¶36].  While SCOs would ordinarily

rotate posts, Defendant's witness admitted that having an SCO who only worked in the infirmary would "not impair the functions of the Sheriff's Office." [Doc. 50 at 32:13–17].

Importantly, when the defendant in <u>Pickering</u> was presented with an apparently contradictory fitness-for-duty assessment, the defendant followed up directly with the physician, explaining the requirements of the plaintiff's physician and getting a definitive answer on whether she was able to perform the essential functions of her job. 75 F. Supp. 2d at 1377. Here, when Defendant became concerned that Plaintiff's restrictions were "not in line with her job duties and description," Defendant requested "a fitness for duty certification from her medical provider." [Doc. 49 ¶¶73–74]. But when the additional documentation was, as discussed above, vague and ambiguous, Defendant did not follow up with either physician by explaining the essential duties of Plaintiff's position, getting clarification on the extent of Plaintiff's restrictions, or getting clarification on when and how Plaintiff's condition was expected to improve. Defendant's decision not to get clear answers prevents it from succeeding at summary judgment.

The regulations governing the ADA say "it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability" to "identify the precise limitations resulting from the disability and potential reasonable

accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). The Equal Employment Opportunity Commission ("EEOC") explains that, if the employer does "not know enough about the individual's disability or the limitations that disability would impose on the performance of the job," then "it may be necessary for the employer to initiate a more defined problem solving process." 29 C.F.R. § Pt. 1630, App. *Process of Determining the Appropriate Reasonable Accommodation*. In addition, the EEOC provides a helpful example. Upon learning that a sack handler "is disabled by a back impairment," the employer tries "to ascertain precisely the barrier posed by the individual's specific disability" and "learns that the individual can, in fact, lift the sacks to waist level." Id. *Reasonable Accommodation Process Illustrated*. The employer and the individual then identify an accommodation—a dolly—that can allow the sack handler to perform the essential functions of her position despite the limitation. Id.[3]

---

[3] The requirement that an employer consider providing leave as a reasonable accommodation is also subject to the "interactive process." See EEOC Publication: *Employer-Provided Leave and the Americans with Disabilities Act*, available online at https://www.eeoc.gov/eeoc/publications/ada-leave.cfm (published May 9, 2016; last visited May 11, 2021) (stating that if leave is not available under any program like the FMLA, "then an employer should promptly engage in an '**interactive process**' with the employee . . . to obtain relevant information to determine the feasibility of providing the leave as a reasonable accommodation without causing an undue hardship" (emphasis in original)).

Here, Defendant should have, like the defendant in <u>Pickering</u>, gotten clarification "to ascertain the precise job-related limitations imposed by [Plaintiff's] and how those limitations could be overcome with a reasonable accommodation" in light of the "purpose and essential functions" of Plaintiff's position. <u>See</u> 29 C.F.R. § Pt. 1630, App. *Process of Determining the Appropriate Reasonable Accommodation*; <u>see also</u> <u>Pickering</u> 75 F. Supp. 2d at 1377. While Defendant requested a fitness-for-duty form, and Plaintiff volunteered to get information from her neurologist, that additional information did not adequately resolve the issue. The note from the neurologist said Plaintiff needed to "limit her contact with inmates," but the fitness-for-duty form contained no such restriction. <u>Compare</u> [Doc. 48-3] <u>with</u> [Doc. 48-8]. The fitness-for-duty form said Plaintiff was limited to "sedentary work," but the note from the neurologist contained no such restriction. <u>Id</u>. The fitness-for-duty form said Plaintiff's condition would markedly improve within a month, while the note from the neurologist was mute on the subject. <u>Id</u>.

Defendant asserts that it arranged the January 7, 2019 meeting with Plaintiff "to discuss her limitations." [Doc. 49 ¶82]. Yet, there is no evidence that Defendant discussed Plaintiff's limitations with her. Instead, Defendant reviewed the fitness-for-duty form and unilaterally decided to terminate Plaintiff *before* the meeting took place. [<u>Id</u>. ¶¶87–88]. In other words, Defendant took ambiguous medical records and made

assumptions about Plaintiff's health without consulting Plaintiff.  Defendant ignored the suggestion that Plaintiff's condition would markedly improve and chose to believe that it would not.  Defendant also chose to believe that the requirement that Plaintiff "limit her contact with inmates" meant Plaintiff could have *no* contact with inmates and chose to ignore the fact that the restriction was missing from Plaintiff's fitness-for-duty form.  A reasonable jury might believe Defendant's interpretation of the evidence and find Plaintiff was unable to perform the essential functions of her position and that she would not recover anytime in the foreseeable future.  But a reasonable jury could also find that Plaintiff's limitations did not prevent her from performing the essential functions of her position and/or that Plaintiff's condition would have improved enough within a month that she could "perform [the] essential and additional functions of [her] job."  See [Doc. 48-3 at 4].

Defendant should have gotten a clear answer on what "limit her contact with inmates" meant and should have gotten clarification on how and when Plaintiff's condition was expected to improve.  See [Doc. 48-8]; [Doc. 48-3 at 4].  Indeed, Defendant was ostensibly required to do so by the regulations governing the ADA.  See 29 C.F.R. § 1630.2(o)(3).  Instead, Defendant fired Plaintiff on the day it received the fitness-for-duty form without discussing the matter with her.  [Doc. 49 ¶¶87–89]; see also [Docs. 48-2, 52-2].  Because Defendant did not seek out clear answers, the Court

is left with vague and ambiguous evidence that must be construed in the light most favorable to Plaintiff.  See Matsushita, 475 U.S. at 587.  And because a reasonable jury could believe either Plaintiff's or Defendant's interpretation of the evidence, summary judgment is inappropriate.  Anderson, 477 U.S. at 248 (holding that a "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

As a final matter, Defendant also argues Plaintiff "would have posed a direct threat to the safety of herself, other SCOs, and inmates."  [Doc. 44-2 at 15].  But this argument is premised on Defendant's argument that "Plaintiff could not interact with inmates" at all, which as discussed above is just one interpretation of Plaintiff's doctors' notes.  [Id.].  Defendant also notes the fitness-for-duty form stated Plaintiff "could only perform sedentary work," but again Defendant points to no evidence that Plaintiff needed to stand/walk for more than 20 minutes at a time.  See [id.]; see also [Doc. 48-3 at 3–4].  As Plaintiff points out, even if the limited contact/sedentary restrictions did pose a "direct threat," Defendant could still have reasonably accommodated her by providing "leave during that time."  [Doc. 48 at 15–16].  Again, because Defendant chose not to obtain more information about Plaintiff's expected recovery, there is no evidence regarding what restrictions Plaintiff might still have after her condition improved.  The Court is left only with the vague statement that Plaintiff

would have "recover[ed] sufficiently to perform [the] essential and additional functions of [her] job" with one month of leave.  [Doc. 48-3 at 4].  Construing the facts in the light most favorable to Plaintiff, there was no direct threat because any significant risk to health or safety could have been "eliminated by reasonable accommodation."  See 42 U.S.C. § 12111(3).

As discussed above, a reasonable jury could find that Plaintiff was "disabled" and that she was a "qualified individual" because she could have performed the essential functions of her position with a reasonable accommodation—either allowing Plaintiff to continue working in the medical unit control tower or granting her one month of leave to "recover sufficiently to perform [the] essential and additional functions of [her] job." See [Doc. 49 ¶¶67, 71]; [Doc. 48-3 at 4].  To the extent it was unclear which of those accommodations would have worked, the burden was on Defendant to seek out more information, which it did not do.  See 29 C.F.R. § 1630.2(o)(3).  Because Defendant denied Plaintiff "reasonable accommodations," it engaged in "discrimination" within the meaning of the ADA.   42 U.S.C. § 12112(b)(5)(A).  As such, a reasonable jury could find Plaintiff has presented sufficient evidence to meet all the elements of her ADA/Rehabilitation Act discrimination claims. See Holly, 492 F.3d at 1255–56.

B.      The ADA/Rehabilitation Act Retaliation Claims

In the absence of direct evidence, the Eleventh Circuit applies the McDonnell Douglas[4] framework for assessing ADA retaliation claims.  Batson v. Salvation Army, 897 F.3d 1320, 1328–29 (11th Cir. 2018); Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1287 (11th Cir. 1997).  Under the McDonnell Douglas burden-shifting framework, the plaintiff first has the burden of establishing a *prima facie* case.  See McDonnell Douglas, 411 U.S. at 802; Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).  If the plaintiff meets her burden, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  McDonnell Douglas, 411 U.S. at 802; Burdine, 450 U.S. at 254; Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*).  The plaintiff is then given an opportunity to show that the defendant's proffered nondiscriminatory reason was merely a pretext for discriminatory intent.  Burdine, 450 U.S. at 253; Chapman, 229 F.3d at 1024.

A prima facie case of retaliation requires Plaintiff to show: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal link between the protected activity and the adverse action.  Batson, 897 F.3d at 1329.  Defendant argues Plaintiff did not engage in statutorily protected activity

---

[4] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

because she "could not identify a reasonable accommodation." [Doc. 44-2 at 16–17]. But a "plaintiff need not prove that the conduct . . . was actually unlawful"; she need only "show that [s]he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." Branscomb v. Sec'y of Navy, 461 F. App'x 901, 906 (11th Cir. 2012). As discussed above, the Court concludes that Plaintiff requested reasonable accommodations. But at a bare minimum, Plaintiff reasonably and in good faith believed she was requesting a reasonable accommodation, and that request resulted in her termination—the quintessential adverse employment action. See Freytes-Torres v. City of Sanford, 270 F. App'x 885, 894 (11th Cir. 2008); see also Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1457 (11th Cir. 1998) (holding the plaintiff demonstrated a causal connection when "the series of adverse employment actions commenced almost immediately after" the plaintiff's protected activity). Thus, Plaintiff has shown a prima facie case of retaliation.

Defendant argues Plaintiff was terminated due to "her inability to perform the essential functions the [*sic*] SCO position," which could be a legitimate, non-discriminatory reason. [Doc. 44-2 at 17]. But as discussed above, a reasonable jury could find that Plaintiff could, in fact, perform the essential functions of her position with a reasonable accommodation, and thus Defendant's reliance on Jordan v. City of Union City, Ga., 94 F. Supp. 3d 1328, 1344 (N.D. Ga. 2015) is unpersuasive.

27

A reasonable jury would rightly question Defendant's reliance on Plaintiff's "fainting spells or possible blackouts" as the "determining factor" for her termination when there is no evidence whatsoever that Plaintiff ever had "fainting spells or possible blackouts." See [Doc. 50 at 22:4–9]. And a reasonable jury would be suspicious of Defendant's insistence that Plaintiff could not perform the essential functions of her position within the near future when Defendant's own witness admitted that the fitness-for-duty form says that the restrictions listed therein "would be temporary[,] for I guess another month." [Id. at 41:17–22]. As discussed above, Defendant did not engage in the required "interactive process" to see if it could accommodate Plaintiff. Instead, Defendant simply overlooked the "plain" indication that the restrictions giving rise to its concerns were "temporary" and chose not to ask what "limit her contact with inmates" meant. See [id.]; see also [Doc. 48-8]. A reasonable jury could find that Defendant did not actually believe Plaintiff could not perform the essential functions of her position and "that [retaliation] was the real reason" for the termination. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993). Plaintiff has thus presented a triable issue of fact as to pretext.

Defendant also argues Plaintiff's "retaliation claim impermissibly restates failure [sic] to accommodate claim." [Doc. 44-2 at 18]. If Defendant had simply denied Plaintiff's request to continue working in the medical unit control tower and/or

28

denied her additional leave, Defendant would be correct.  But Defendant went farther by terminating Plaintiff, which is indisputably an adverse employment action.  See Long v. Alabama Dep't of Human Res., 650 F. App'x 957, 968 (11th Cir. 2016); Freytes-Torres, 270 F. App'x at 894.  As such, the case relied on by Defendant is inapposite.  In Lucas v. W.W. Grainger, Inc., 257 F.3d 1249 (11th Cir. 2001), the plaintiff did not suffer an adverse employment action and instead argued the "adverse action against" was "refusing to maintain him on light duty work."  257 F.3d at 1261.  As in Lucas, other courts have dismissed retaliation claims based on nothing but the denial of an accommodation.  See Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1288 (11th Cir. 1997); Calvo v. Walgreens Corp., 340 F. App'x 618, 625 (11th Cir. 2009); Santacrose v. CSX Transp., Inc., 288 F. App'x 655, 658 (11th Cir. 2008).  But where, as here, "Defendant went beyond merely denying Plaintiff's [accommodation] request and decided to terminate her," a retaliation claim can stand.  Brooks v. Peachtree Hospice of Georgia, LLC, 1:18-cv-05649-ELR-LTW, [Doc. 15 at 14–15] (N.D. Ga. Jan. 14, 2020), *adopted* [Doc. 19] (March 18, 2020).

    C.    Whether Defendant Received Federal Funds

Defendant contends that Plaintiff's Rehabilitation Act claims fail because "Plaintiff did not present evidence [it] received federal funding during the 2018–2019 fiscal year."  [Doc. 44-2 at 19–20].  To state a claim under the Rehabilitation Act,

Plaintiff must show Defendant received "federal financial assistance."  See McMullen v. Wakulla Cty. Bd. of Cty. Comm'rs, 650 F. App'x 703, 704 (11th Cir. 2016).  Plaintiff notes that Defendant received funds from the DEA/DOJ narcotics program during the fiscal year in question and that the program explicitly tells participants that they are subject to the Rehabilitation Act.  [Doc. 48 at 19].

Contrary to Defendant's argument, Plaintiff did introduce evidence from which a reasonable jury could conclude that Defendant received federal funds from the DEA/DOJ narcotics program during the 2018–19 fiscal year.  During the deposition of Defendant's Rule 30(b)(6) witness, Plaintiff introduced evidence showing Clayton County received $325,000 from the DEA/DOJ narcotics program during the year in question.  [Doc. 50 at 60:19–61:6].  Defendant admits that it receives federal funding from the DEA/DOJ narcotics program and that all of its funding comes through the county.  [Id. at 59:4–12, 61:24–63:18].

Defendant's argument seems to be that it did not "receive" any federal funds because: "The Sheriff's Office did not access any of that [narcotics program money].  So if any was given by the county to the Sheriff's Office we didn't use it, we didn't access it, we didn't touch it . . . ."  [Id. at 64:4–8].  Defendant cites no authority for the proposition that an entity does not "receive" federal assistance unless it "accesses" the money given to it.  [Doc. 44-2 at 18–20]; see also [Doc. 52].  Nor has the Court found

any authority in support of Defendant's argument.  The regulations governing the

Rehabilitation Act provide that a "Recipient" is an entity "to which Federal financial

assistance *is extended* directly or through another recipient."  28 C.F.R. § 41.3(d)

(emphasis added).  There is no requirement that the recipient "access" the assistance,

only that the assistance be "extended" to or provided to the entity.  This comports with

the ordinary meaning of the word "receive."  A person could, for example, receive a

gift and never open or "access" it; that does not change the fact of receipt.  An entity

cannot receive federal funds year in and year out but avoid its responsibilities under

the Rehabilitation Act by deciding to only "use" the federal funds on sporadic, isolated

occasions.  The application of the Rehabilitation Act does not turn on the kind of

gamesmanship advocated by Defendant.

Plaintiff introduced evidence that Clayton County received $325,000 from the

DEA/DOJ narcotics program during the 2018–19 fiscal year.  [Doc. 50 at 60:19–61:6].

To be sure, the mere fact that Clayton County received federal funds does not, *ipso*

*facto*, make Defendant a recipient for purposes of the Rehabilitation Act.  McMullen

v. Wakulla Cty. Bd. of Cty. Commissioners, 650 F. App'x 703, 706 (11th Cir. 2016).

And Defendant's witness did testify that it did not "receive any federal funding in 2018

or 2019."  [Doc. 50 at 59:23–25].  But again, this testimony seems to be based on the

Defendant's contention that because it "didn't access any, [it therefore] didn't receive

any" federal funds.  See [id. at 61:7–11]; see also [id. at 61:15–65:13].  Defendant never suggests the DEA/DOJ narcotics funds are allocated to or used by any other entity.  See [Doc. 44-2 at 18–20]; see also [Doc. 52].  A reasonable jury could conclude that "Federal financial assistance [was] extended" or provided to Defendant "through another recipient"—the county—during the 2018–19 fiscal year, even if Defendant chose not to access the money during that year.  See 28 C.F.R. § 41.3(d).

## II.  Plaintiff's FMLA Claims

Plaintiff brings two kinds of claims under the FMLA: a FMLA interference claim and a FMLA retaliation claim.  The Court addresses each claim in turn.

### A.  FMLA Interference

A claim for interference with an FMLA right only requires a plaintiff to "demonstrate that he was entitled to but denied the right."  Strickland v. Water Works and Sewer Bd., 239 F.3d 1199, 1208 (11th Cir. 2001).  But the employer can avoid liability if "it can demonstrate that it would have discharged the employee" regardless of the employee's exercise or attempted exercise of his FMLA rights.  Id.  The question is whether the plaintiff's FMLA leave "was the *proximate* cause" of the adverse employment action.  Schaaf v. Smithkline Beecham Corp., 602 F.3d 1236, 1242 (11th Cir. 2010) (emphasis in original).  Thus, the plaintiff must show that the adverse action occurred "because (*i.e. for the reason that*)" he exercised or attempted to exercise his

FMLA rights.  Id. at 1243 (emphasis in original).

As an initial matter, Defendant seems to suggest—but does not explicitly argue—that Plaintiff was not entitled to FMLA rights because "Plaintiff exhausted her 12 weeks of FMLA leave in 2018." [Doc. 44-2 at 21].  However, the record indicates Plaintiff would have been eligible for additional FMLA leave less than three weeks after her request.  See [Doc. 49 ¶77]; see also [Doc. 50 at 47:4–48:8].  Eleventh Circuit precedent is clear that "a pre-eligible employee has a cause of action if an employer terminates her in order to avoid having to accommodate that employee with rightful FMLA leave rights once that employee becomes eligible."  Pereda v. Brookdale Senior Living Communities, Inc., 666 F.3d 1269, 1275 (11th Cir. 2012).  The question is whether a reasonable jury could find that Defendant terminated Plaintiff to avoid having to provide her with FMLA leave starting on January 23, 2019.  The Court concludes that a jury could.

Defendant argues the "same decision defense" applies in this case because it "terminated Plaintiff because she could not perform the essential functions of her job" and would have done "so irrespective of her FMLA leave." [Doc. 44-2 at 20–21].  As discussed above, a reasonable jury could conclude that Plaintiff was able to perform the essential functions of her position with a reasonable accommodation—either remaining in the medical unit control tower or taking one month of leave.  A reasonable

jury could disbelieve Defendant's explanation for Plaintiff's termination and decide that Defendant's decision to fire Plaintiff was motivated by a desire to avoid having to accommodate her disability.  For the same reasons that a jury could decide Defendant fired Plaintiff to avoid offering her non-FMLA protected leave from January 7–22, a jury could also find that Defendant's decision to fire Plaintiff was motivated by a desire to avoid offering her FMLA protected leave from January 23 onward.  See Batson, 897 F.3d at 1331–32 ("Because Batson raises evidence from which a reasonable jury could conclude that [the defendant's] proffered explanations for terminating Batson were pretextual, she likewise raises a genuine dispute of material fact as to whether she would have been terminated regardless of her request for FMLA leave.").

Defendant knew that Plaintiff would be eligible to take 12 weeks of protected leave starting on January 23, 2019 and knew that Plaintiff planned to take such leave. [Doc. 49 ¶¶76–77].  But Defendant decided to terminate Plaintiff just a few days after she requested FMLA leave and a few weeks before she was eligible.  See [id. ¶¶82, 88–89].  Defendant was supposed "to discuss [Plaintiff's] limitations" with her at the January 7, 2019 meeting, but there is no indication that Southerland did so.  See [id. ¶82].  Instead, Defendant decided to terminate Plaintiff *before* the meeting because Defendant believed, based on the fitness-for-duty form, that "Plaintiff could not perform the essential functions of her position." [Id. ¶¶87–88].  However, that decision

required Defendant to ignore the "plain" indication in the fitness-for-duty form that Plaintiff's inability to perform the essential functions of her position was "temporary." See [Doc. 50 at 41:17–22]. If Plaintiff had been permitted to take one month of leave—some of which would have been protected under the FMLA—she would have "recover[ed] sufficiently to perform [the] essential and additional functions of [her] job." [Doc. 48-3 at 4].

A reasonable jury could find that Defendant terminated Plaintiff the day it received the fitness-for-duty form without discussing Plaintiff's limitations with her because Defendant wanted to use Plaintiff's "temporary" inability to perform the essential functions of her job to avoid offering Plaintiff FMLA-protected leave. In other words, a jury could conclude Plaintiff was terminated "because (*i.e. for the reason that*)" she planned to take leave protected by the FMLA beginning on January 23, 2019. See Schaaf, 602 F.3d at 1243 (emphasis in original). By showing she was terminated before she could take the FMLA-protected leave she needed to recuperate, Plaintiff has shown she "was entitled to but denied [a] right" under the FMLA. See Strickland, 239 F.3d at 1208. For the foregoing reasons, neither party is entitled to summary judgment on Plaintiff's FMLA interference claim.

B.   FMLA Retaliation

The FMLA makes it "unlawful for any employer to discharge or in any other

manner discriminate against any individual for opposing any practice made unlawful" by the FMLA's subchapter regarding leave requirements.  29 U.S.C. § 2615(a)(1)(2). In the absence of direct evidence, the Eleventh Circuit also applies the McDonnell Douglas framework for "evaluating a claim of retaliation under the FMLA." Brungart v. BellSouth Telecommunications, Inc., 231 F.3d 791, 798 (11th Cir. 2000).  A prima facie case of retaliatory discharge requires a plaintiff to "show that (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected conduct and the adverse employment action." Id.  Requests for FMLA leave are protected under the FMLA.  See Pereda, 666 F.3d at 1274.  And termination "is an ultimate employment action that is undeniably adverse." Freytes-Torres, 270 F. App'x at 894.  To the extent Defendant seems to challenge Plaintiff's ability to make out a prima facie case, Defendant's sole argument is that no evidence indicates "Plaintiff's termination is in any way related to her statement of intent to take leave." [Doc. 44-2 at 22].  But, of course, Plaintiff was terminated just days after she requested FMLA leave, and such "close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." Brungart, 231 F.3d at 799.

Defendant argues Plaintiff "state[d] her intent to take FMLA leave after her

neurologist and physician weighed in on her fitness for duty," but that is not correct. Plaintiff inquired about taking FMLA leave on January 3 and the fitness-for-duty form was submitted on January 7. [Docs. 48-9, 48-3]. To be sure, Defendant "asked Plaintiff to submit a fitness for duty form" before Plaintiff suggested she wanted to take FMLA leave. See [Doc. 44-2 at 22]; see also [Doc. 49 ¶74]. But the decision to request a fitness-for-duty form is not the adverse employment action being challenged, the termination is. Defendant, understandably, does not want to suggest that it had already made the decision to terminate Plaintiff *before* it received the fitness-for-duty form. Instead, Defendant argues that it made the decision to terminate Plaintiff *after* she requested FMLA leave. See [Doc. 48-9]; [Doc. 49 ¶¶82, 88–89]. Because of the "close temporal proximity between the employee's protected conduct and the adverse employment action" Plaintiff has shown a prima facie case of retaliation in violation of the FMLA. Brungart, 231 F.3d at 799.

Defendant's main argument is that it "terminated Plaintiff because she could not perform the essential functions of her position" and that Plaintiff has no evidence showing this "reasoning as pretextual." [Doc. 44-2 at 22–23]. Again, Defendant has provided a potential legitimate, non-discriminatory reason for Plaintiff's termination. But again, a reasonable jury could conclude that Defendant's purported reason was pretext for a retaliatory motive, as discussed above. Indeed, Plaintiff's claim for FMLA

retaliation is, if anything, stronger than her other claims.  Defendant's witness basically admitted Plaintiff was terminated for taking FMLA leave.   Defendant's witness suggested Plaintiff's condition "went on for several years"[5] and brought up the fact that Plaintiff "had taken FMLA" leave.  [Doc. 50 at 36:16–19].  When asked "how does that factor into the decision to terminate?" Defendant's witness responded, "It was one of the contributing factors."  [Id. at 36:20–22].  By showing her decision to take FMLA leave was "one of the contributing factors" leading to her termination, Plaintiff has demonstrated she was retaliated against for taking statutorily protected leave.  See 29 C.F.R. § 825.220(c) (providing that "employers cannot use the taking of FMLA leave as a negative factor in employment actions").

**III.   Plaintiff's § 1983 Claim**

Last, Plaintiff brings a claim for an alleged violation of her "rights under the U.S. Constitution, including her rights under the First and Fourteenth Amendments." [Doc. 8 ¶¶83–86].  Because Defendant Victor Hill is sued only in "his official capacity," the real party in interest "is the governmental entity and not the named official."  See [id. ¶6]; see also Hafer v. Melo, 502 U.S. 21, 25 (1991).  As such,

---

[5] As discussed above, there is no evidence that Plaintiff's condition had an impact on her ability to perform her position "for several years."  See [Doc. 50 at 36:7–38:9].

Plaintiff must show the alleged constitutional violations were caused by a policy or custom, in violation of Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978).  See Hafer, 502 U.S. at 25.  To prove a Monell violation, Plaintiff must show her constitutional rights were violated pursuant to either: (1) an officially promulgated policy or (2) an unofficial custom or practice shown through the repeated acts of a final policymaker.  Grech v. Clayton Cty., Ga., 335 F.3d 1326, 1329 (11th Cir. 2003).

Defendant contends that Plaintiff "fails to establish Sheriff Hill authorized the criminal trespass warning" but does not cite to any evidence, presumably because that argument is directly contradicted by the testimony of Defendant's own witness. [Doc. 44-2 at 23].  Defendant's witness testified that "[t]he sheriff," i.e. Victor Hill, "made the decision to issue [the] criminal trespass warnings to former employees" and that it is the Sheriff's Office's "official policy."  [Doc. 50 at 83:17–84:1].[6]  Thus, Plaintiff has presented evidence that the issuance of criminal trespass warnings to former employees was an official policy of Defendant or, at a minimum, an unofficial

---

[6] Defense counsel objected that this testimony was "[b]eyond the scope of the topic."  [Doc. 50 at 83:20].  Not so.  Defendant's 30(b)(6) witness was designated to testify regarding Defendant's "policy regarding the issuance of criminal trespass notice[s] to employees who have been terminated."  [Id. at 68:4–9].  The question "Who made the decision to issue these criminal trespass warnings to former employees?" is within the scope of the topic.  See [id. 83:17–19].

custom or practice directed by a final policymaker—the sheriff himself.  The question then is: Does the policy violate Plaintiff's constitutional rights?

In its initial brief, Defendant does not argue the criminal trespass warning—issued for no reason other than the fact that Plaintiff was terminated—is not a constitutional violation.  The closest Defendant comes is pointing out that Plaintiff "exercised her right to access by filing a lawsuit in Clayton County Superior Court." [Doc. 44-2 at 23].  This argument is unsupported by a citation to any evidence and is found nowhere in Defendant's Statement of Material Facts.  [Id.]; [Doc. 44-1].  As such, the Court will not consider Defendant's unsubstantiated assertion.  N.D. Ga. Loc. R. 56.1(B)(1) (providing that the court "will not consider any fact . . . set out only in the brief and not in the movant's statement of undisputed facts").[7]

In its reply brief, Defendant for the first time argues the policy did not cause "violations of [Plaintiff's] rights under the First and Fourteenth Amendments."  [Doc. 52 at 15].  A party "who does not raise an issue in his opening brief may not do so in his reply brief."  United States v. Durham, 795 F.3d 1329, 1330 (11th Cir. 2015) (en

---

[7] Even if the Court were to consider this fact, it does nothing to support Defendant's position.  Defendant cites no authority suggesting that it is absolved of a constitutional violation that occurs when it threatens to arrest someone for exercising their constitutional rights so long as the person ignores the threat and exercises their rights anyway.  See [Doc. 44-2 at 23].  Nor has the Court found any authority for such a proposition.

*banc*).  Even if the Court were to consider Defendant's argument, it misses the mark. Plaintiff is not challenging the "reasonable and viewpoint neutral" restrictions on the use of a nonpublic forum, and she is not asserting "a class of one claim."  See [Doc. 52 at 15].  A law—or in this case, policy—is subject to strict scrutiny if it "treats individuals differently" and "impinges on a fundamental right."  Leib v. Hillsborough Cty. Pub. Transp. Comm'n, 558 F.3d 1301, 1306 (11th Cir. 2009); see also Tennessee v. Lane, 541 U.S. 509, 522–23 (2004) (noting that infringements on "basic constitutional guarantees," such as the public "right of access to [court] proceedings," are "subject to more searching judicial review").

The case of Catron v. City of St. Petersburg, 658 F.3d 1260 (11th Cir. 2011) is almost directly on point.  In Catron, the Eleventh Circuit held that the plaintiffs' constitutional rights were violated when the defendant enforced its trespass ordinance in a way that prevented the plaintiffs from having access to a public place "as ordinarily used by the public."  Id. at 1266–67.  The Catron Court recognized that the right of public access "in not absolute" but held that citizens who have not been charged with any wrongdoing have the right to access public places "under the ordinary conditions in which [the spaces] are made available to the general public."  Id. at 1267 n.5.  By "issuance of a trespass warning," the defendant deprived the plaintiffs of their constitutional rights "before any trespass."  Id. at 1266 n.4.  Applying the balancing

test outlined in Matthews,[8] the Eleventh Circuit held the plaintiffs' due process rights were violated because the defendant had "a lot of discretion" to issue trespass warnings and defendant provided no procedure "for the recipient of a trespass warning to challenge the warning or for the warning to be rescinded." Catron, 658 F.3d at 1267–68.

Here, as in Catron, Defendant apparently has absolute discretion to issue trespass warnings that forbid individuals "from the premises" of places that are generally open to the public. [Doc. 48-11]. Defendant is vested with unfettered discretion to determine whether those individuals have "a legitimate reason to enter" said public places and can decide to arrest anyone vising the Clayton County Courthouse for a reason Defendant decides is not "legitimate." [Id.]. There is ostensibly no way for Plaintiff or any other former employee to challenge the deprivation other than "to violate the trespass warning and subject [her]self to a criminal prosecution for trespass," which is not an adequate procedural protection. See Catron, 658 F.3d at 1269.

Such an arbitrary deprivation of a person's right to access public places "under the ordinary conditions in which [the spaces] are made available to the general public"

_____

[8] Mathews v. Eldridge, 424 U.S. 319 (1976).

is unconstitutional at the best of times.  See id. at 1267 n.5.  But it is especially troubling here where Defendant—who has been sued by former employees many times— may be trying to use the threat of arrest to discourage former employees from accessing the courts.  See, e.g., Cain v. Hill, N.D. Ga. Case No. 1:14-cv-03323-SCJ; Gore v. Hill, N.D. Ga. Case No. 1:08-cv-02497-MHS; Blasingim v. Hill, N.D. Ga. Case No. 1:08-cv-02117-JEC; Daniel v. Hill, N.D. Ga. Case No. 1:06-cv-00223-TWT; Bartlett v. Hill, N.D. Ga. Case No. 1:06-cv-00211-TWT; Hill v. Hill, N.D. Ga. Case No. 1:05-cv-00271-CAM; Massengale v. Hill, N.D. Ga. Case No. 1:05-cv-00189-TWT.  Plaintiff has presented sufficient evidence to create a triable issue of fact as to whether Defendant's policy of issuing trespass warnings to former employees violates her constitutional rights.

## CONCLUSION

For the reasons explained above, the undersigned **RECOMMENDS** that the Motion for Summary Judgment ([Doc. 44]) **be GRANTED in part and DENIED in part**.  Specifically, the undersigned **RECOMMENDS** the Motion be **GRANTED** as to Defendant Clayton County because that Defendant did not employ Plaintiff. [Doc. 48 at 4–5].  The Court further **RECOMMENDS** that the Motion be **DENIED** in all other respects.  As this is a final Report and Recommendation and there are no

other matters pending before this Court, the Clerk is directed to terminate the reference to the undersigned.

**SO ORDERED AND REPORTED AND RECOMMENDED**, this ___20___ day of May, 2021.

_____
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE